# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **KLUG ENTERPRISES, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:25-cv-01065** |
| | ) | **Judge Aleta A. Trauger** |
| **ROBIN J. VOS ENTERPRISES, INC.** | ) | |
| *doing business as* TS Food Packaging, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This dispute concerns an unwritten contract between the parties, according to which the defendant was to pay the plaintiff commissions for soliciting business on its behalf. The defendant moves to dismiss the Amended Complaint, which brings a claim for breach of contract and related claims under similar Tennessee and Wisconsin statutes. For the reasons set forth herein, the defendant's Motion to Dismiss (Doc. No. 12) will be denied.

## I.  PROCEDURAL HISTORY

The operative Amended Complaint (Doc. No. 7 ("FAC")) brings three "counts": breach of contract (Count I) (FAC ¶¶ 24–29), violation of Wis. Stat. § 134.93 (Count II) (*id.* ¶¶ 30–32), and violation of Tenn. Code Ann. § 47-50-114 (Count III) (*id.* ¶¶ 33–35). The defendant filed a Motion to Dismiss (Doc. No. 12) with an accompanying Memorandum (Doc. No. 13) and Exhibits (Doc. Nos. 13-1, 13-2), to which the plaintiff filed a Response (Doc. No. 17), and in further support of which the defendant filed a Reply (Doc. No. 21). The defendant moves for dismissal under Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 13 at 17.)

## II. LEGAL STANDARDS – RULE 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the complaint's legal sufficiency. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020) (quoting Fed. R. Civ. P. 12(b)(6)). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). But a complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 557).

In ruling on a motion to dismiss for failure to state a claim, the court accepts the complaint's well-pleaded allegations as true, construes the complaint in the light most favorable to the plaintiff, and draws all reasonable inferences in the plaintiff's favor. *Eastep v. City of Nashville*, 156 F.4th 819, 826 (6th Cir. 2025) (citing *Courtright v. City of Battle Creek*, 839 F.3d 513, 517 (6th Cir. 2016)), *cert. denied sub nom. Eastep v. Carrick*, 224 L. Ed. 2d 275 (Mar. 23, 2026).

When presented with a Rule 12(b)(6) motion, the court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)). Otherwise, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

2

## III. FACTS

Defendant Robin J. Vos Enterprises, Inc., doing business as TS Food Packaging ("TS Food"), is a Wisconsin corporation based in Wisconsin that manufactures and packages snacks for other companies in a 100,000 square foot facility in Wisconsin. (FAC ¶¶ 2, 6.) TS Food's customers provide it with ingredients and packaging materials, which TS Food turns into consumer-sized snack packages for distribution. (*Id.* ¶¶ 6, 8.) For example, non-party Freeland Foods, LLC—known as "Go Raw"—contracted with the defendant to package its line of pumpkin seeds, among other products. (*Id.* ¶¶ 8–9; Doc. No. 13-1 ("Go Raw Contract").)[1]

Plaintiff Klug Enterprises, LLC ("Klug")[2] enters into agreements with companies to solicit customers on their behalf and receives commissions resulting from the relationship between those companies and their customers.[3] (FAC ¶ 5.) Since 2017, pursuant to an unwritten agreement

---

[1] The court may consider the Go Raw Contract, which the defendant has filed, in ruling on the Rule 12(b)(6) Motion because it is "referred to in the Complaint and . . . central to the claims contained therein." *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 534 (6th Cir. 2012) (quoting *Bassett*, 528 F.3d at 430). (*See, e.g.*, FAC ¶ 27 ("KLUG is entitled to commissions over the duration of the Go Raw Contract.").)

[2] The plaintiff invokes this court's diversity jurisdiction under 28 U.S.C. § 1332. (FAC ¶ 3.) TS Food is a citizen of Wisconsin. (TS Food's Rule 7.1(a)(2) Disclosure Statement, Doc. No. 11 at 1.) Klug, a limited liability company, has two members: one is a "resident" of Tennessee and the other is a "resident" of Florida. (FAC ¶ 1.) The plaintiff alleges its members' residences even though "it has long been settled that residence and citizenship are wholly different things." *Prime Rate Premium Fin. Corp., Inc. v. Larson*, 930 F.3d 759, 765 (6th Cir. 2019) (alteration adopted) (quoting *Steigleder v. McQuesten*, 198 U.S. 141, 143 (1905)). "[C]itizenship for purposes of 28 U.S.C. § 1332(a) means domicile rather than residence." *Stifel v. Hopkins*, 477 F.2d 1116, 1120 (6th Cir. 1973) (citations omitted). And the plaintiff has not complied with Local Rule 7.02(b) by filing a Rule 7.1(a)(2) Disclosure Statement, on which it ought to have provided its members' citizenship. The court assumes without deciding that it is has diversity jurisdiction and the plaintiff will be ordered to comply with the Local Rules.

[3] The plaintiff describes itself as an "independent sales representative who enters into agreements with principals" and the defendant as a "principal." (FAC ¶¶ 5, 31, 34.) As the court will discuss, the success of the plaintiff's statutory claims depends on the accuracy of these descriptions, which the defendant contests. (Doc. No. 13 at 5–7.) The question of whether the parties fall within certain statutory definitions is a question of law. *Accord Goodman v. Com. Bank & Tr. Co.*, 587 F. Supp. 3d 681, 688 n.4 (W.D. Tenn. 2022) ("[W]hether the [bank] check meets a

3

between the parties (the "Agreement"),[4] Klug alleges that it "has been operating as an independent sales representative for TS Food" and in that capacity has solicited and secured six customers for TS Food. (*Id.* ¶¶ 7, 22.) The parties have no fully integrated written contract, but the terms of the Agreement, "including the commission structure and when commissions are paid, have been memorialized in emails, through performance, and through course of dealing for eight years" and are "well understood by both parties." (*Id.* ¶¶ 7, 11.) Neither party has filed documents memorializing their Agreement, described the contents of any such documents, or fully explained the terms of the Agreement.

Relevant here, the plaintiff "solicited and secured the [c]ustomer Freeland Foods, LLC [Go Raw] for TS Food[] in 2017"; Go Raw and TS Food entered into their first "formal packaging agreement" in 2019, and, since "at least 2021" and through 2024, TS Food paid Klug a 2-cent commission for every pack of Go Raw pumpkin seeds it packaged, among other commissions on other products. (*Id.* ¶¶ 8–9; *see also id.* App. A (listing commission rates on other products (*e.g.*, 13 cents per pack of tea).) In 2023, Klug was "instrumental in securing" a second, five-year agreement between Go Raw and TS Food, to wit, Klug "brought [Go Raw] to TS Food in 2017" and "TS Food[] relied on Klug's relationship with [Go Raw] to serve [as] an intermediary during negotiations, had Klug review pricing and contractual terms, and sought Klug's final approval of

---

legal definition provide[d] under Tennessee statute is, strictly speaking, not a statement of fact but a question of law for the Court to decide."), *aff'd*, 72 F.4th 122 (6th Cir. 2023). While courts must accept plaintiffs' factual allegations as true when ruling on Rule 12(b)(6) motions, a "'legal conclusion couched as a factual allegation' is not entitled to a presumption of truth." *Crawford v. Tilley*, 15 F.4th 752, 762 (6th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). The court therefore does not construe the plaintiff's terminology as factual allegations and does not accept them as true.

[4] In line with the pleading and briefing, the court construes the FAC as alleging the existence of one at-issue agreement between the parties. (*See, e.g.*, FAC ¶ 25 ("TS Foods entered into *an agreement* with Klug." (emphasis added)); Doc. No. 13 at 3 ("By contrast to its unwritten *agreement* with Klug . . . ." (emphasis added)); Doc. No. 17 at 2 ("[T]he terms of *the agreement* . . . have been memorialized . . . ." (emphasis added)).)

4

the agreement." (*Id.* ¶ 9. *See also id.* ¶ 16 (describing the Go Raw Contract as one "Klug had . . . procured").) The Go Raw Contract runs from September 2023 through August 2028, unless it is terminated under its terms. (Go Raw Contract at 1; *id.* §§ 3.1–3.2.) TS Food would regularly send Klug copies of Go Raw invoices so that Klug could "track the number of units sold and then invoice TS Foods for the commission payment due." (FAC ¶ 10.) And TS Food would send Klug commission payments to its Nashville office "within 7 weeks of the Go Raw invoice." (*Id.*) Thus, under the Agreement, for several years TS Food routinely paid Klug commissions in direct proportion to the number of snacks it packaged for Go Raw, pursuant to the Go Raw Contract, which runs through at least 2028.[5]

In February 2025, however, TS Food informed Klug that they needed to discuss their Agreement, and it stopped making commission payments to Klug in "an attempt to financially weaken Klug, impact cash flow, and gain leverage in its efforts to unilaterally modify" their Agreement. (*Id.* ¶¶ 12, 18, 20.) After months of back and forth, in a July 18, 2025 letter, TS Food informed Klug that it would terminate their relationship on October 16, 2025. (*Id.* ¶¶ 13–19; *see* Doc. No. 13-2 ("Termination Letter")[6].) In its Termination Letter, TS Food stated that, until the termination of their relationship, it would "continue to act in accordance with the parties' past course of dealing," including by paying "the amounts KLUG claims it is owed through [October 16, 2025]." (Termination Letter.) The plaintiff alleges that, as of the date of the Termination Letter,

---

[5] Go Raw, "in its sole discretion," may renew the Go Raw Contract for "up to 5 additional one-year periods." (Go Raw Contract Ex. B § 7.)

[6] The court may consider the Termination Letter, which the defendant has filed, for the same reason it may consider the Go Raw Contract. (*See, e.g.*, FAC ¶ 23 (stating that, in the Termination Letter, TS Food indicated it would not pay commissions the plaintiff claims it owes).) While the plaintiff refers to a "July 19, 2025 letter," it clearly means to refer to the July 18, 2025 Termination Letter the defendant has filed. Furthermore, the plaintiff notes, in its Response, that it "has no opposition to the court considering the . . . Termination Letter (Document 13-2) submitted by the Defendant." (Doc. No. 17 at 2 n.1.)

TS Food had already breached their Agreement because it owed Klug $120,000 in commissions on Go Raw products, most of which was past due according to their "normal 7-week payment cycle." (FAC ¶¶ 18–19.) On August 1, 2025, TS Food paid Klug "$86,549.66 for commissions dating back to early February 2025." (*Id.* ¶ 21.) The court infers, therefore, that, as of August 1, TS Food owed Klug roughly $33,000 in commissions. In addition, Klug "forecasted over $1.2 million in anticipated commissions from TS Food[] over the remaining duration of the initial term of the Go Raw Contract," which Klug reasonably interpreted the Termination Letter to say that TS Food would not pay. (*Id.* ¶ 23.)

## IV. DISCUSSION

### A. Breach of Contract

Courts sitting in diversity apply state substantive law. *Berk v. Choy*, 607 U.S. 187, 192 (2026) (citing 28 U.S.C. § 1652). To determine which state's substantive law applies, the court applies the forum state's choice-of-law rules. *Andujar v. Hub Grp. Trucking, Inc.*, 161 F.4th 1014, 1017 (6th Cir. 2025) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Tennessee law provides that, in the absence of a choice-of-law provision, as here, a "contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent." *Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624, 632 (Tenn. Ct. App. 2017) (quoting *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 474–75 (Tenn. Ct. App. 2003)).

The plaintiff does not allege where the Agreement was executed. And neither party has conducted a choice-of-law analysis. Instead, both parties apply both Wisconsin and Tennessee contract law. (*See, e.g.*, Doc. No. 13 at 11 (citations omitted); Doc. No. 17 at 10 & n.3 (citations omitted).) The court will not *sua sponte* decide an issue the parties have not presented. *In Re*

6

*Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 143 F.4th 718, 725–26 (6th Cir. 2025) (citing *NASA v. Nelson*, 562 U.S. 134, 147 n.10 (2011)).[7]

In any case, the elements of a breach of contract claim are the same in Wisconsin and Tennessee: the existence of a contract, breach, and damages. *Pagoudis v. Keidl*, 988 N.W.2d 606, 612 (Wis. 2023) (citation omitted); *Edward Jackson Younger Fam. Irrevocable Tr. by & through Younger v. Ross*, No. E2024-01338-COA-R3-CV, 2025 WL 3158820, at *16 (Tenn. Ct. App. Nov. 12, 2025) (citations omitted), *appeal denied* (Mar. 30, 2026). Indeed, the parties point to no meaningful difference between Tennessee and Wisconsin contract law. Further, both Wisconsin and Tennessee recognize oral contracts so long as the parties agree to sufficiently definite terms. *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 502 (7th Cir. 1998) ("In order for there to be an oral contract, there must also be a definite and certain promise that produces a meeting of the minds with respect to its essential terms." (citing *Witt v. Realist, Inc.*, 118 N.W.2d 85, 93 (Wis. 1962))); *Johnson v. Lefeve*, No. M2024-01484-COA-R3-CV, 2026 WL 523193, at *6 (Tenn. Ct. App. Feb. 25, 2026) ("An oral agreement is enforceable, but the party seeking to enforce it must prove (1) mutual assent to the contract's terms and (2) that the terms are sufficiently definite to be enforceable." (quoting *Davidson v. Holtzman*, 47 S.W.3d 445, 453 (Tenn. Ct. App. 2000))).

The plaintiff alleges that TS Food breached the Agreement by failing to timely pay commissions, terminating their relationship, and stating that it would not pay commissions on orders Klug had already secured after their relationship's termination. (FAC ¶ 25.) Further, the plaintiff alleges that TS Food breached the Agreement's implied duty of good faith and fair dealing

---

[7] In any future briefing on dispositive motions, the parties must conduct a choice-of-law analysis or else agree on what law applies. *Accord AtriCure, Inc. v. Meng*, 12 F.4th 516, 525 (6th Cir. 2021) ("apply[ing] Ohio law without resolving any choice-of-law-questions" where the defendant did not dispute the plaintiff's contention that Ohio law applied) (citing *Masco Corp. v. Wojcik*, 795 F. App'x 424, 427 (6th Cir. 2019)).

7

by "refusing to pay Klug for commissions it has already earned and attempting to leverage those commissions due to compel Klug to modify its existing agreement." (*Id.* ¶ 26.) In support of its "anticipatory breach" theory, Klug argues that, under the "procuring cause doctrine," it is "entitled to commissions over the duration of the Go Raw Contract." (*Id.* ¶ 27.) Klug also alleges that it is entitled to commissions on the five other accounts it procured for TS Food. (*Id.* ¶ 28.) And, although the plaintiff does not discuss this in its briefing, the FAC appears to allege that, as of August 1, 2025, TS Food owed Klug roughly $33,000 in commissions on the Go Raw Contract.

The defendant argues that it paid all commissions due by the date of termination and that it was free to terminate the parties' Agreement and stop paying commissions. (Doc. No. 13 at 11–15.) The defendant further argues that, while the plaintiff alleges that it procured certain *customers*, it does not allege that it procured *orders* after the termination of their Agreement, and therefore it is not entitled to perpetual commissions. (*Id.* at 15–17.) Under Tennessee's procuring cause doctrine, a sales representative is "presumed" to be entitled to commissions "on sales that she personally worked to procure." *Reaves v. CWS Powder Coatings Co., L.P.*, No. 3:22-cv-00158, 2023 WL 3635704, at *11 (M.D. Tenn. May 24, 2023). But the doctrine protects the "acquisition of *orders*, not the acquisition of the *customer*." *Id.* (quoting *William Kehoe Assocs. v. Ind. Tube Corp.*, 891 F.2d 293 (Table), 1989 WL 146439, at *2 (6th Cir. Dec. 5, 1989)). Thus, "there is a distinction between procuring a *customer* and procuring a *sale*, and only the latter is automatically protected in the absence of express contract terms" specifying commissions on all sales placed by those customers. *Id.* As the court has discussed, Klug does not describe at length the Agreement's terms. But construing the pleading in the light most favorable to the plaintiff, the Agreement provided, at least, that TS Food would pay Klug commissions on Go Raw products it packaged for the duration of the Go Raw Contract, as demonstrated by the parties' course of dealings. At a

8

minimum, TS Food had consistently paid Klug commissions in direct proportion to orders Go Raw placed with TS Food, pursuant to the Go Raw Contract, from September 2023 to February 2025. TS Food had not paid Klug all of the commissions it owed as of August 1, 2025 and has stated that it will not pay any further commissions, which the plaintiff estimates to be worth over one million dollars. The plaintiff has alleged the existence of a contract, breach, and damages, and the defendant's arguments to the contrary are unconvincing at the motion to dismiss stage.

The defendant argues that, because the plaintiff alleges it has paid all commissions owed before termination, there is no allegation of "past" breach. (Doc. No. 13 at 11–13.) While the plaintiff does not make this argument, the defendant's contention that, according to the FAC, "all commissions owed prior to termination were fully paid," is not true. (Doc. No. 13 at 2.) The FAC alleges that, as of July 18, 2025, the defendant owed the plaintiff $120,000 in unpaid commissions and roughly two weeks later paid $86,549.66 toward that $120,000. That leaves $33,450.34 in unpaid commissions, which constitutes past breach and damages.

As for the claim for anticipatory breach, the plaintiff alleges that it brought Go Raw to TS Food and procured the Go Raw Contract; that TS Food agreed to pay it commissions on orders resulting from the Go Raw Contract; and that it did so for over a year before it purported to terminate the Agreement in a misguided effort to avoid future payments it was contractually obliged to pay.

TS Food argues that merely terminating an agreement does not constitute an anticipatory breach. (Doc. No. 13 at 14–15.) Rather, parties can "conclude an at-will arrangement on notice" without breaching the agreement. (*Id.* at 15.) Further, TS Food argues that "Klug's 1.2 million damages forecast is premised on receiving commissions for hypothetical post-termination orders." (*Id.* at 16.) Put broadly, TS Food argues that Klug "seeks perpetual commissions without mutual

9

agreement." (*Id.*) But Klug does not contend that TS Food "could not terminate the independent sales representative relationship." (Doc. No. 17 at 9 (addressing the statutory claims).) Rather, Klug argues, it procured the Go Raw Contract for TS Food and is entitled to commissions resulting therefrom for its duration—of at least five years—as demonstrated by their course of dealings. (*Id.* at 12–13.) Moreover, while the defendant argues that Klug was not the procuring cause of any specific future Go Raw orders, as the plaintiff notes, the Go Raw Contract, which Klug "procured" (FAC ¶ 25), required Go Raw to place regular "minimum order quantities." (*Contrast* Doc. No. 13 at 15 ("The [FAC] does not . . . plead facts showing KLUG was the procuring cause of specific customer orders that would occur after October 16, 2025."), *with* Doc. No. 17 at 9 (citing Go Raw Contract § 1.6).) Indeed, the Go Raw Contract requires Go Raw to send "Purchase Orders for Products to [TS Food] in at least pre-determined minimum order quantities ('MOQ') specified in Exhibit B." (Go Raw Contract § 1.6.) Exhibit B, in turn, states that the Purchase Orders "shall be subject to commercially reasonable MOQ's." (*Id.* Ex. B § 3.)

As alleged, therefore, as of Fall 2023, when Go Raw and TS Food signed the five-year Go Raw Contract, Klug was be entitled to a steady, five-year stream of commissions. The plaintiff has alleged the existence of a contract according to which, at a minimum, it is owed commissions through Fall 2028. The plaintiff has alleged that the defendant owes it unpaid commissions on past orders and that the defendant has stated it will not pay commission on future orders which, according to the Go Raw Contract, are not merely hypothetical. The plaintiff has stated a colorable breach of contract claim.

### B.      Commission Statutes

The plaintiff brings two counts under similar Tennessee and Wisconsin Statutes. (FAC ¶¶ 30–35.) Again, the parties do not conduct a choice-of-law analysis, and the court will not conduct a choice-of-law analysis *sua sponte*. Because the parties do not suggest that the statutes

10

are meaningfully different for present purposes, and because the statutes are similar in relevant respects, the court will consider them together.

Tennessee's Commission Statute, Tenn. Code Ann. § 47-50-114, governs the payment of commissions pursuant to a contract between a "principal" and a "sales representative." It provides that the "terms of the contract between the principal and sales representative shall determine when a commission becomes due." *Id.* § 47-50-114(b)(1). Relevant here, Tennessee's Commission Statute applies only to contracts between "principal[s]" and "sales representative[s]." A "principal" is a "person who: (A) Manufactures, produces, imports, or distributes a product for wholesale; (B) Contracts with a sales representative to solicit orders for the product; and (C) Compensates the sales representative, in whole or in part, by commission." *Id.* § 47-50-114(a)(2). A "sales representative" is a "a person who contracts with a principal to solicit wholesale orders and who is compensated, in whole or in part, by commission, but does not include one who places orders or purchases for such person's own account for resale." *Id.* § 47-50-114(a)(3). The defendant does not contend that the plaintiff is not a "person."

The Wisconsin Commission Statute, Wis. Stat. Ann. § 134.93, provides that "a commission becomes due as provided in the contract between the principal and the independent sales representative." *Id.* § 134.93(2)(a). It further provides that, when "there is no written contract . . . a commission becomes due according to the past practice used by the principal and the independent sales representative." *Id.* § 134.93(2)(b). The Wisconsin Commission Statute contains definitions similar to that of Tennessee's statute. An "independent sales representative" is a person who, absent certain exceptions no party argues are relevant here, "contracts with a principal to solicit wholesale orders and who is compensated, in whole or in part, by commission." *Id.* § 134.93(1)(b). A "principal" is an entity that "1. Manufactures, produces, imports or distributes a product for

11

wholesale. 2. Contracts with an independent sales representative to solicit orders for the product. 3. Compensates the independent sales representative, in whole or in part, by commission." *Id.* § 134.93(1)(c).

TS Food argues that both statutes are inapplicable because it is not a "principal" and Klug is not a "sales representative" or "independent sales representative." (Doc. No. 13 at 5–10.) As the court explained above, both statutes govern contracts involving a "principal," which necessarily "[m]anufactures, produces, imports, or distributes a product for *wholesale.*" Tenn. Code Ann. § 47-50-114(a)(2)(A) (emphasis added); Wis. Stat. Ann. § 134.93(1)(c)(1) (same, but omitting a comma). And both statutes govern sales representatives, who necessarily "contract[] with . . . principal[s] to solicit *wholesale* orders." Tenn. Code Ann. § 47-50-114(a)(3) (emphasis added); Wis. Stat. Ann. § 134.93(1)(b) (same). Thus, a principal must be a wholesaler and the sales representative must solicit wholesale orders. The defendant argues that, because it is not a wholesaler and the plaintiff does not solicit wholesale orders, the defendant is not a "principal" and the plaintiff is not a "sales representative." Neither statute defines "wholesale."

The defendant cites several cases in support of its position that the Agreement does not concern wholesale orders. (Doc. No. 13 at 6–7.) In *Brock v. Positive Changes Hypnosis*, a case requiring interpretation of the Tennessee Commission Statute, our sister court adopted the "long-standing and commonly-used definition" of "wholesale": "the sale of goods to a retailer who resells to a consumer." 534 F. Supp. 2d 793, 796 (W.D. Tenn. 2008) (citations omitted). Relying on *Brock*, the defendant argues that the FAC does not allege that TS Food sells goods to a retailer who resells to consumers. Rather, "TS Food manufactures and packages goods using raw materials provided by its customers and charges a packaging fee for those services." (Doc. No. 13 at 6 (citing FAC ¶ 5).) In other words, the defendant states, it is a "contract manufacturer" and "not engaged

12

in the manufacture, production, import, or distribution of any 'product for wholesale.'" (*Id.* at 6–7.) The fact that the "defendant's downstream channel partners . . . are engaged in wholesale activities" does not make the defendant a wholesaler, it maintains. (*Id.* at 6 (first citing *Alston v. Nat'l Safety Incentives, Inc.*, No. 06-2141-JPM/DKV, 2008 WL 11318324, at *1–2 (W.D. Tenn. Jan. 31, 2008); and then citing *S. Pharmacy Consultants LLC v. Smart Fill Mgmt. Grp., Inc.*, No. 3:13-cv-1100, 2015 WL 5254367, at *5 (M.D. Tenn. Sept. 9, 2015) (Campbell, J.)).

The cases the defendant cites do not advance its argument. *Brock* concerned a business "operat[ing] . . . in . . . a retail capacity, selling hypnosis service programs directly to consumers, rather than to retailers." *Brock*, 435 F. Supp. 2d at 796. In that context, the court explained that, because the company sold directly to consumers, it was not engaged in wholesale. *Id.* Thus, while the court stated that wholesale involves the sale of goods to retailers, its point was that wholesale does not involve the sale directly to consumers, which was at issue in the case. In *Alston*, the defendant was a business that "implement[ed] employee incentive programs" at companies by awarding employees points for reaching certain goals, like productivity or safety. *Alston*, 2008 WL 11318324, at *1. The points could be redeemed for merchandise from a non-party company. The plaintiff had entered into agreements with the defendant to receive commissions on contracts she helped procure for the defendant and brought suit when the defendant terminated their relationship and stopped paying commissions. *Id.* The court first held that the defendant did not "engage[] in the sale of any tangible good such that it would qualify as a principal for the purposes of the Commission Statute." *Id.* at *2. Next, the court held that the mere fact that employees could redeem incentive points the defendant disbursed for merchandise from a third-party did not mean that the defendant distributed products for wholesale. *Id.* Here, the defendant operates a large facility in which it accepts packaging material and ingredients from companies and then "manufacture[s],

13

package[s], and sell[s]" the resulting products to snack companies. (Go Raw Contract § 1.1.) That is, while the defendant may be a contract manufacturer, as it says, the Go Raw Contract describes TS Food as selling snack products to Go Raw. *Alston* is not analogous.

The plaintiff makes several points in response to the defendant's argument. First, the plaintiff cites *Black's Law Dictionary*'s definition of wholesale: "[t]he sale of goods or commodities usu[ally] to a retailer for resale, and not to the ultimate consumer." *Wholesale*, *Black's Law Dictionary* (12th ed. 2024). (Doc. No. 17 at 7.) When statutes do not define terms, courts may "'look to authoritative dictionaries' to determine the term's meaning." *Davis v. Reilly*, 683 S.W.3d 739, 743 (Tenn. 2024) (quoting *State v. Deberry*, 651 S.W.3d 918, 925 (Tenn. 2022)). The Supreme Court of Tennessee "often . . . look[s] to *Black's Law Dictionary* for a possible answer." *State v. Jones*, 589 S.W.3d 747, 759 (Tenn. 2024) (collecting cases). The Supreme Court of Wisconsin also looks to *Black's Law Dictionary*, among others, when statutes do not define terms. *Int. of A.L.*, 923 N.W.2d 827, 831 (Wis. 2019) (noting that it "rel[ies] on dictionary definitions when the legislature fails to provide a definition in the statute" and then citing *Black's*, among other dictionaries) (citing *Wis. DOR v. River City Refuse Removal, Inc.*, 729 N.W.2d 396. (Wis. 2007)). *Black's* supports the plaintiff's argument, insofar as it defines wholesale to *usually* involve sale to retailer, not the "ultimate consumer." *Black's* contemplates that, at least sometimes, wholesalers sell to entities other than retailers, as here. And *Black's* contrasts "wholesale" with "retail," as *Brock* did. *Wholesale*, *Black's Law Dictionary* (12th ed. 2024) ("*Cf. Retail*").

Second, the plaintiff points to a similar Minnesota statute, which defines "wholesale orders" as "the solicitation of orders for goods *by persons in the distribution chain for ultimate sale at retail*, and also includes material, component, or part orders for use or incorporation into a product, and later resold." Minn. Stat. Ann. § 325E.37 subdiv. 1(f) (emphasis added). While not

14

dispositive, of course, this advances the plaintiff's argument. Third, the plaintiff argues that the cases the defendant cites for support are inapposite. (Doc. No. 17 at 7–8.) At this stage in the litigation, the plaintiff has the better argument: the relevant distinction, in determining whether a company is engaged in wholesale, is whether it sells to consumers, not whether it sells to retailers. Here, the defendant does not sell to consumers; it sells to snack companies that presumably sell to retailers. The court will not dismiss the statutory claims on the basis that the parties do not deal in "wholesale" orders merely because companies like Go Raw are not retailers.

The defendant next argues that Klug is not a "sales representative," under either statute, because it does not "contract[] with a principal to solicit wholesale *orders*," as it correctly notes both statutes require. (Doc. No. 13 at 7.) As the defendant puts it, "Klug was not soliciting orders at all," but, rather, "Klug's business was identifying *customers* who wanted to engage with TS Food for its manufacturing services." (*Id.* (citing FAC ¶ 8–9, 28).) The defendant continues: "Klug's role was one of account procurement, not solicitation of wholesale product orders." (*Id.*) In response, the plaintiff argues that it procured the five-year Go Raw Contract, according to which Go Raw was obliged to place minimum orders with TS Food. (Doc. No. 17 at 9 (citing Go Raw Contract § 1.6).) As the court explained above, the Go Raw Contract does require Go Raw to place regular minimum orders with TS Food. Moreover, as alleged, the plaintiff is due, and has received pursuant to a course of dealing, commissions based on those orders, not for merely bringing the Go Raw account to TS Food.

For support, the defendant cites *Southern Pharmacy Consultants, LLC v. Smart Fill Management Group, Inc.*. There, the plaintiff's principial was president of a non-profit organization of independent pharmacies in Tennessee that collectively negotiated prices from drug wholesalers to "provide leverage in price negotiations with pharmaceutical distributors

15

comparable to that enjoyed by larger pharmacy chains." *S. Pharmacy*, 2015 WL 5254367, at *1. The defendant was a company that provided "business services to independent pharmacies, including facilitating this type of group purchasing with drug wholesalers." *Id.* The parties agreed that the plaintiff's organization would dissolve and its members would join the defendant, who would take over negotiating with pharmaceutical distributors for them. *Id.* Further, the parties agreed that the defendant would pay the plaintiff a "fee" on certain products the plaintiff's members bought. *Id.* After the defendant did not pay the plaintiff in accordance with their agreement, the plaintiff brought suit. *Id.* On summary judgment, the court held that the Tennessee Commission Statute "does not apply to intangible items," including the service the plaintiff provided, which was "recruiting pharmacies for membership, not to solicit wholesale orders of pharmaceuticals." *Id.* at *5. Further, and of particular relevance here, the court held that the plaintiff was not a "sales representative" because, "[a]lthough Plaintiff recruited pharmacies to become Defendant's members, which entailed a commitment to purchase 95% of its pharmaceuticals from Defendant, Plaintiff did not itself solicit those wholesale orders." *Id.*

The defendant argues that, "[j]ust as a member pharmacy's purchase obligation did not satisfy the wholesale order requirement, neither does Go Raw's minimum monthly commitment convert KLUG's customer procurement activities into wholesale-order solicitation." (Doc. No. 21 at 3.) The plaintiff frames the facts differently: it did not "merely identify a customer; it secured a five-year commitment with minimum monthly orders." (Doc. No. 17 at 9.)

The court will not dismiss the statutory claims without the benefit of discovery. According to the parties' course of dealing, the defendant paid the plaintiff commissions on orders Go Raw placed under the contract Klug procured. If Klug had not solicited the orders resulting from the Go Raw Contract, there would have been no reason for TS Food to have paid Klug commissions

16

directly tied to those orders. It may turn out that TS Food has accurately characterized the work Klug did for it as a mere introduction to Go Raw and other customers, which could explain why TS Food sought to reconsider its commission arrangement. But the court cannot adjudicate those issues on a motion to dismiss.

Last, the defendant argues that, even if the commission statutes apply, it complied with them by giving Klug sufficient notice and paying previously earned commissions. (Doc. No. 13 at 10–11.) Both statutes contain provisions governing termination. The Tennessee Commission Statute provides that, when an unwritten contract for commissions is terminated, "all commissions due shall be paid within fourteen (14) days of termination." Tenn. Code Ann. § 47-50-114(c). Further, it provides that, if a principal, "acting in bad faith," fails to timely make payments after a contract's termination, it may be liable for "exemplary damages" not to exceed "treble the amount of the commissions owed to the sales representative," plus the "sales representative's reasonable attorney's fees and court costs." *Id.* § 47-50-114(d). The Wisconsin Commission Statute provides that principals must provide independent sales representatives 90 days' notice of termination and that, when a contract is terminated, the "principal shall pay an independent sales representative all commissions that are due to the independent sales representative at the time of termination." Wis. Stat. Ann. § 134.93(3)–(4). And it also contains an exemplary damages provision for unpaid commissions. *Id.* § 134.93(5).

The defendant argues that it paid Klug all of the commissions due by the date of termination and that it need not pay commissions past that. (Doc. No. 13 at 10–11.) First, as the court has discussed, the FAC alleges over thirty thousand dollars in unpaid commissions as of August 1, 2025 and alleges no further payments. More importantly, the defendant does not engage with the plaintiff's argument that, while TS Food was free to terminate the parties' relationship, it could

not renege on the terms of the Agreement, which, according to past practice, requires TS Food to pay Klug commissions on Go Raw orders, which, under the Go Raw Contract, continue through 2028. (Doc. No. 17 at 9.) The court will not dismiss the statutory claims.

## V. CONCLUSION

For the foregoing reasons, the Motion to Dismiss will be denied. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge

18